***********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Baddour, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between the named employee and the named employer.
3. The employee's weekly compensation rate is the maximum compensation rate for 2005 or $704.00.
4. The employee sustained a low back injury on or about December 13, 2005.
5. The low back injury arose out of and in the course of employment and is compensable.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is currently forty-six years old with a date of birth of April 18, 1963. On December 13, 2005, while employed as a shop manager by Employer-Defendant, Plaintiff was going out of his office door and noticed that there was a table loaded with metal which he needed to push out of his way in order to walk through. Plaintiff shoved the table in an effort to get the wheels in the right direction to push forward. Plaintiff experienced pain in his lower back which radiated up to his mid back. 2. Defendants accepted Plaintiff's low back injury as compensable by filing a Form 60. Plaintiff was out of work due to his low back injury from February 16, 2007 to March 25, 2007. Defendants paid Plaintiff temporary total disability benefits for the time period that he was out of work. Plaintiff has continued to work for Employer-Defendant from March 25, 2007 to the present. *Page 3 
3. Following his December 13, 2005 work injury, Plaintiff initially received treatment for his low back from Concentra Medical Centers. Plaintiff received conservative treatment from Concentra Medical Centers from December 15, 2005 through January 17, 2006. While receiving treatment from Concentra Medical Centers, Plaintiff did not complain of any cervical symptoms.
4. On January 13, 2006, an MRI scan was obtained of Plaintiff's lumbar spine which revealed extremely severe central canal stenosis with complete compression of thecal sac at the L4-5 level secondary to a combination of posterior bi-lobed herniated nucleus pulposus, facet hypertrophy and ligamentum flava laxity and minimal posterior central subligamentous protrusion at L5-S1 without neural compression. Following Plaintiff's lumbar MRI scan, Dr. Henry Adomonis from Concentra referred Plaintiff to a neurosurgeon.
5. On February 20, 2006, Plaintiff was seen by Dr. Russell Margraf with Raleigh Neurosurgical Clinic, Inc. for evaluation of low back pain and bilateral lower extremity radiating pain. At thAt visit, Plaintiff reported thAt he had injured his back in November/December 2005 and thAt since thAt injury, he had experienced low back pain with bilateral lower extremity radiating pain, right greater than left with activity. Dr. Margraf reviewed the MRI scan thAt was obtained of Plaintiff's lumbar spine and stated thAt it showed "L4-5 central canal stenosis and — and lumbar spondylosis, which is basically arthritis — a severe arthritis in the back." Dr. Margraf diagnosed Plaintiff with lumbar stenosis and neurogenic claudication, which is pain down the legs. Dr. Margraf recommended thAt Plaintiff undergo an L4-5 lumbar decompression and posterior lateral fusion surgery. *Page 4 
6. On April 11, 2006, Plaintiff was seen by Dr. J. Lawrence Frank with Triangle Orthopaedic Associates, P.A. for a second opinion evaluation. Dr. Frank agreed with Dr. Margraf's surgical recommendation.
7. On February 16, 2007, Plaintiff underwent an L4-5 laminectomy with bilateral proximal L5 foraminotomies and an L4-5 instrumented fusion with pedical screws and rods, performed by Dr. Margraf. A patient undergoing fusion surgery is in the supine position or lying on his back when he becomes fully anesthetized. Then the patient is turned to a prone position or on his stomach for the surgery to be performed.
8. Four or five people, including Dr. Margraf, assist in turning the patient over from a supine to a prone position. This involves rolling the patient from a stretcher onto the operating room table that is aligned parallel with the stretcher. The stretcher and operating table are at equal heights. When the patient is rolled onto the operating table, his head remains in a neutral position, meaning that the patient's head is neither turned to the right or left. The medical personnel involved in turning the patient over from a supine to a prone position include an anesthesiologist/nurse anesthetist, two operating room personnel, the circulating nurse in the room, and the physician. All of these individuals are trained in how to move a patient into the prone surgical position.
9. During his lumbar surgery, Plaintiff's head was positioned into a pillow-like ring that provided padding to protect his eyes from any type of pressure. Plaintiff's head was positioned face down and was neither turned to the left or to the right. Plaintiff was positioned so that there was no strain or stress on any portion of the spine, including the cervical spine. Dr. Margraf's staff checks for pressure points numerous times during the surgery to ensure that there are no pressure points that might cause pressure sores on the skin or a nerve injury to the arms or *Page 5 
legs. Dr. Margraf and his staff try to avoid the patient's cervical spine being jerked, including when the anesthesiologist is placing the endotracheal tube, when they are turning the patient to the prone position, and when the patient is being returned to the bed from which he came after the surgery is over.
10. Dr. Margraf saw Plaintiff immediately after Plaintiff woke up from his anesthesia. Dr. Margraf does not recall Plaintiff complaining of any numbness or tingling in his arms, hands or fingers or any other kind of cervical complaints at that time. The nurse in the post-anesthesia recovery unit noted that at 3:00 p.m, the time at which Plaintiff arrived to the post-anesthesia recovery unit, Plaintiff denied numbness or tingling. Subsequently, at 4:40 p.m., it was noted that Plaintiff was alert and oriented and again denied numbness or tingling. Plaintiff first complained of cervical symptoms the day after his surgery, when he complained of some numbness in his hands.
11. Plaintiff was discharged from the hospital on February 20, 2007. Subsequently, on February 26, 2007, Plaintiff returned to Dr. Margraf. At thAt visit, Plaintiff did not complain of any numbness or tingling in his arms, hands, or fingers or any other cervical symptoms.
12. At his March 12, 2007 visit with Dr. Margraf, Plaintiff complained of numbness in his fourth and fifth fingers and arms bilaterally.
13. On or about August 17, 2007, Dr. Margraf assigned a 15% permanent partial disability rating to Plaintiff's back for his low back injury. Plaintiff has reached maximum medical improvement for his low back injury and does not require any additional medical treatment for his low back condition.
14. On October 27, 2007, an MRI scan was obtained of Plaintiff's cervical spine which revealed left-sided disc *Page 6 
herniation at C6-7, disc bulge at C5-6 and C6-7, small central disc herniation at C3-4 and small left-sided disc herniation at T2-3. Thereafter, on January 28, 2008, Plaintiff underwent EMG/nerve conduction studies, which were normal with no evidence of radiculopathy.
15. At his February 4, 2008 visit with Dr. Margraf, Plaintiff complained of neck and shoulder pain. Plaintiff additionally complained of occasional numbness in the ring and index finger on the left hand. Dr. Margraf could not correlate his symptoms with an EMG abnormality or with the MRI scan and therefore he recommended thAt Plaintiff undergo conservative treatment including physical therapy, muscle relaxers, and non-inflammatory, non-steroidal anti-inflammatory agents. Dr. Margraf diagnosed Plaintiff with cervical spondylosis.
16. Dr. Margraf opined that Plaintiff's current cervical complaints are probably not related to his lumbar surgery performed on February 16, 2007, including the positioning and turning of Plaintiff in connection with the surgery. Dr. Margraf additionally opined that the findings on Plaintiff's MRI scan are not related to Plaintiff's February 16, 2007 lumbar surgery. Dr. Margraf testified that he based his opinion on the fact that the findings on the MRI scan showed a graduation of the arthritis in his spine, which had developed over a period of years and would not result from one specific event.
17. Dr. Margraf further testified that it was impossible to know whether the disc herniation at C6-7 was present before or after Plaintiff's February 16, 2007 lumbar surgery. Dr. Margraf normally performs about 200 surgeries each year and has been performing spinal surgeries for twelve years, yet he cannot recall a lumbar surgical patient waking up with a new cervical problem who had no history of a cervical problem.
18. On May 29, 2008, Plaintiff was seen by Dr. Thomas Dimmig with Triangle Orthopaedic Associates, P.A. for an independent medical evaluation with regard to his cervical *Page 7 
condition. Plaintiff complained of numbness in the ulnar border, which is the small finger side, of both hands. Plaintiff also complained of pain in his shoulder blades and shoulders, which at times radiated into the hands. Dr. Dimmig reviewed the cervical MRI and noted in his record pertaining to Plaintiff's May 29, 2008 visit that the MRI "findings are more chronic in nature." Dr. Dimmig further noted "[h]ow the neck symptoms are related to the back is a little unclear. It is very possible that his positioning during surgery and during his recovery he developed symptoms related to the neck. In that regard the symptoms about the neck and arms could be indirectly related to the surgery which was workers comp in nature."
19. During his deposition, Dr. Dimmig expressed a different opinion, stating that it was his medical opinion that Plaintiff's complaints of numbness, tingling, and pain in both upper extremities were related to Plaintiff's positioning and turning performed in connection with Plaintiff's lumbar surgery. However, Dr. Dimmig specifically admitted that his opinion as to causation was based solely on the temporal relationship between the onset of Plaintiff's cervical symptoms and Plaintiff's lumbar surgery.
20. Dr. Dimmig acknowledged that since no cervical MRI scan had been performed prior to Plaintiff's lumbar surgery, it was impossible to know whether the findings on Plaintiff's cervical MRI scan were present prior to Plaintiff's February 2007 lumbar surgery. Dr. Dimmig further testified that the findings from Plaintiff's cervical MRI scan could simply have become symptomatic without any traumatic incident.
21. Considering Dr. Dimmig's admission that his opinion as to causation was based solely on the temporal relationship between Plaintiff's lumbar surgery and the onset of Plaintiff's cervical complaints, Dr. Dimmig's opinion as to causation is based on conjecture and speculation and is not competent evidence on the issue of causation. *Page 8 
22. The Full Commission also finds that Dr. Dimmig's opinion as to causation noted in the May 29, 2008 report differs from the opinion Dr. Dimmig expressed during his deposition. The Full Commission finds that the equivocal nature of Dr. Dimmig's opinion as to causation is further evidence that Dr. Dimmig's opinion as to causation is based on conjecture and speculation and is not competent evidence on the issue of causation.
23. Plaintiff failed to meet his burden of proving that his cervical condition was caused by or was the natural consequence of his December 13, 2005 work injury.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The person claiming the benefit of compensation has the burden of showing that the injury complained of resulted from an injury by accident arising out of and in the course of employment.Henry v. Leather Co.,231 N.C. 477, 57 S.E.2d 760 (1950). "[W]here a second injury arises from an earlier injury and the primary injury arises out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment." Everett v. WellCare Nursing Services,180 N.C. App. 314, 319, 636 S.E.2d 824, 828 (2006). It is well established that an expert that establishes causation on the basis of "post hoc, ergo propter hoc," which is to say in Latin, "after this, therefore because of this" is not competent evidence as to causation. Young v. Hickory Business Furniture,353 N.C. 227, 232, 538 S.E.2d 912, 916 (2000).
2. Plaintiff failed to carry the burden of proving by competent evidence that a causal relationship existed between the work-related accident and the post-surgical cervical condition for which compensation is sought. Click v. Freight Carriers,300 N.C. 164, 265 S.E.2d 389 *Page 9 
(1980). Therefore, Plaintiff failed to meet his burden of proving that his cervical condition was caused by his December 13, 2005 work incident or that his cervical condition is a direct and natural result of his December 13, 2005 accident. Id.
3. Plaintiff is not entitled to receive any medical or indemnity compensation for his cervical condition as he did not meet his burden of proving that his current cervical condition is compensable under the N.C. Workers' Compensation Act. Id.; N.C. Gen. Stat. § 97-2 (6).
4. Defendants had reasonable grounds to defend this claim at hearing and therefore, the taxation of attorney's fees in this matter is not warranted. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for medical treatment for his cervical condition is hereby DENIED.
2. Each side shall bear its own costs.
This the 31st day of July, 2009.
S/___________________ STACI T. MEYER COMMISSIONER
 CONCURRING: S/___________________ CHRISTOPHER SCOTT *Page 10 
COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1